## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-3444

JOSE LAZO, derivatively on behalf of
SEASTAR MEDICAL HOLDING
CORPORATION,

       Plaintiff,

v.

ERIC SCHLORFF, CARYL BARON,
RICK BARNETT, ALLAN COLLINS,
ANDRES LOBO, BRUCE RODGERS,
RICHARD RUSSELL, and KENNETH
VAN HEEL,


       Defendants,

-and-

SEASTAR MEDICAL HOLDING
CORPORATION,

       Nominal Defendant.

---

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

---

Plaintiff Jose Lazo ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of SeaStar Medical Holding Corporation ("SeaStar" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Eric Schlorff ("Schlorff"), Caryl Baron ("Baron"), Rick Barnett ("Barnett"), Allan Collins ("Collins"), Andres Lobo ("Lobo"), Bruce Rodgers ("Rodgers"), Richard Russell ("Russell"), and Kenneth Van Heel ("Van Heel") (collectively, the "Individual Defendants," and together with SeaStar, the "Defendants") for

breaches of their fiduciary duties as directors and/or officers of SeaStar, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Schlorff and Baron for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SeaStar, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by SeaStar's directors and officers from October 31, 2022 and March 26, 2024 (the "Relevant Period").

2.      SeaStar originally operated as a special purpose acquisition company ("SPAC") named LMF Acquisition Opportunities, Inc. ("LMAO").

3.      On April 22, 2022, the Company, then operating as LMAO, and SeaStar Medical, Inc. ("Legacy SeaStar") announced that they had entered into a merger agreement (the "Merger Agreement"). Legacy SeaStar was a medical technology company focused on developing extracorporeal therapies to reduce the effects of excessive inflammation on vital organs. The Merger Agreement represented that the combined company following the merger would be known

as "SeaStar Medical Holding Corporation" and would be led by the same management team as Legacy SeaStar. Moreover, the Merger Agreement revealed that all Legacy SeaStar shares owned by Legacy SeaStar's existing equity holders would be converted into Class A Common Stock of the combined company (collectively, the "Merger").

4.      Leading up to the Merger, Legacy SeaStar and the Company boasted of the overall prospects of the combined company following the Merger. Indeed, they asserted, *inter alia*, that Legacy SeaStar had an enterprise value of approximately $85 million and further that Legacy SeaStar's Selective Cytopheretic Device ("SCD") was a promising treatment for hyperinflammation and had extensive regulatory and commercial prospects. The companies also announced that Legacy SeaStar was planning to submit an application for U.S. Food and Drug Administration ("FDA") approval for its SCD under the Humanitarian Device Exemption ("HDE") to be commercialized to treat pediatric acute kidney injury ("AKI").

5.      The companies also disclosed that the Merger had already been approved on a unanimous basis by the Company's and Legacy SeaStar's boards, and further that the holders of a majority of Legacy SeaStar's voting power had also approved the Merger.

6.      On July 20, 2022, SeaStar and Legacy SeaStar disclosed to investors that Legacy SeaStar had submitted to the FDA an application under the HDE (the "HDE Application") for use of Legacy SeaStar's SCD for children suffering from AKI, which purportedly "follow[ed a] successful pilot study demonstrating the SCD was safe with probable clinical benefits for pediatric patients[.]"

7.      On October 17, 2022, SeaStar, Legacy SeaStar, and Vellar Opportunity Fund SPV LLC - Series 4 ("Vellar") entered into an agreement for an equity prepaid forward transaction (the "Prepaid Forward Agreement"), pursuant to which Vellar was allowed to purchase through a

broker in the open market shares of Class A common stock, par value $0.0001 per share, of SeaStar (together with the shares of common stock of the post-Merger Company) from holders of those shares, other than SeaStar or SeaStar affiliates.

8.    On October 18, 2022, SeaStar's stockholders voted to approve the Merger.

9.    On October 28, 2022, SeaStar and Legacy SeaStar consummated the Merger pursuant to the terms of the Merger Agreement. Through the Merger, a wholly owned SeaStar subsidiary, LMF Merger Sub, Inc. ("Merger Sub"), merged with and into Legacy SeaStar, with Legacy SeaStar surviving as a wholly owned subsidiary of SeaStar. Upon the completion of the Merger, the Company changed its name to "SeaStar Medical Holding Corporation," and the Company took over Legacy SeaStar's business, operations, and management.

10.    The following trading day, October 31, 2022, SeaStar's common stock and warrants began publicly trading on the Nasdaq Stock Market ("NASDAQ") under the ticker symbols "ICU" and "ICUCW," respectively.

11.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) SeaStar had downplayed the severity and scope of the deficiencies in its financial controls and procedures and had overstated Defendants' efforts to address the same; (2) due to the foregoing, the Company had failed to correctly account for the classification of certain outstanding warrants and the Prepaid Forward Agreement; (3) as a result, the Company was likely to restate one or more of its previously issued financial statements; and (4) due to the foregoing, the Company's post-

Merger business and financial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

12.    The truth began to emerge during post-market hours on May 9, 2023 when the Company published a press release which revealed, among other things, that SeaStar had received a letter from the FDA's Center for Biologics Evaluation and Research ("CBER") rejecting SeaStar's HDE application for its pediatric SCD because "the application [wa]s not approvable in its current form[.]" The Company's CEO, Defendant Schlorff, further revealed that SeaStar had engaged in "a series of [purported] collaborative meetings and correspondence over the past 10 months" with the FDA, and made repeated responses "to the Agency's recommendations," and that there were "current deficiencies cited by the Agency in their letter[.]"

13.    On this news, the Company's stock price fell $0.77 per share, or 39.69%, from a closing price of $1.94 per share on May 9, 2023 to close at $1.17 per share on May 10, 2023. However, despite this partial emergence of the truth and the accompanying hit to SeaStar's stock, the Individual Defendants continued to make false and misleading statements to investors regarding the true scope and severity of SeaStar's financial controls and procedures deficiencies.

14.    The truth fully emerged on March 27, 2024 when the Company announced it wold be restating its financial statements for the fiscal year ended December 31, 2022 and for the interim periods ended March 31, 2023, June 30, 2023, and September 30, 2023 (the "Affected Periods"). Among other things, SeaStar informed investors that the restatement would affect the accounting treatment and classification of certain outstanding warrants and the Prepaid Forward Agreement. In addition, Defendant Schlorff stated that "[t]he restatement . . . is related to the reporting of non-cash accounting items," noting that "[w]e pursued a [SPAC] as our route to become a public company in late 2022 due to the challenging market conditions at that time," but that "[m]any

SPACs, including ours, relied on a host of complex financial instruments" and, "[u]nfortunately, we determined that certain complex financial instruments required accounting treatment that differed from our previous judgment, which led to the need for a restatement."

15.    On this news, the Company's stock price fell approximately $0.04 per share, or 4.84%, from a closing price of approximately $0.75 per share on March 26, 2024 to close at approximately $0.71 per share on March 27, 2024.

16.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

17.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

18.    In light of the Individual Defendants' misconduct, which has subjected SeaStar, its Chief Executive Officer ("CEO"), and its Vice President ("VP") of Finance/former Interim Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Colorado (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

19.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action and of the Company's, the

CEO's, and the VP of Finance/former Interim CFO's liability in the Securities Class Action, of their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of SeaStar's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

21.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25.    Plaintiff is a current shareholder of SeaStar common stock. Plaintiff has continuously held SeaStar common stock at all relevant times.

### Nominal Defendant SeaStar

26.    SeaStar is a Delaware corporation with its principal executive offices at 3513 Brighton Blvd, Suite 410, Denver, Colorado 80216. SeaStar's common stock trades on NASDAQ under the ticker symbol "ICU."

### Defendant Schlorff

27.    Defendant Schlorff has served as the Company's CEO and as a Company director since July 2019. He previously served as the Company's Chief Operating Officer ("COO") from March 2019 to July 2019. According to the Schedule 14A the Company filed with the SEC on November 4, 2024 (the "2024 Proxy Statement"), as of April 12, 2024, Defendant Schlorff beneficially owned approximately 1,039,514 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2024 was $17.93, Defendant Schlorff owned approximately $18.6 million worth of SeaStar stock as of that date.

28.    For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Schlorff received $637,960 in total compensation from the Company. This included $420,000 in salary, $97,863 in stock awards, and $120,097 in option awards. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Schlorff received $2,245,260 in total compensation from the Company. This included $320,000 in salary, $1,655,260 in stock awards, and $270,000 in non-equity incentive plan compensation.

29.    The 2024 Proxy Statement stated the following about Defendant Schlorff:

*Eric Schlorff* has served as a Director and the Chief Executive Officer of SeaStar Medical since July 2019 and as Chief Operating Officer from March 2019 to July 2019. Mr. Schlorff also previously served as a Director of SeaStar Medical from June 2016 to May 2019. From 1999 to 2019, Mr. Schlorff served in multiple roles at The Dow Chemical Company in Midland, Michigan and Indianapolis, Indiana. From June 2016 to February 2019, Mr. Schlorff served as Global Director of Alternative Investments for The Dow Chemical Pension Plan, and Global Finance Leader for Crop Protection & Seeds at Dow AgroSciences from June 2013 to June 2016. Additional leadership positions held by Mr. Schlorff include the Global Market Intelligence Leader at Dow AgroSciences, Global Financial Manager of Royalties at Dow AgroSciences, Senior Investment Manager of Alternative Investments at The Dow Chemical Company, New Business Development of Pharmaceuticals at The Dow Chemical Company, Global Financial Analyst within the New Businesses division at The Dow Chemical Company, and Global Financial Analyst within Dow AgroSciences at The Dow Chemical Company. We believe that Mr. Schlorff is well-qualified to serve on the Board due to his intimate knowledge of our business operation, including the scientific basis, regulatory requirements and sales and marketing channels of the SCD products, as well as his extensive experience in financial planning and managing large and complex organizations.

### **Defendant Baron**

30.    Defendant Baron served as the Company's Finance Controller since 2020, as its Interim CFO since October 28, 2022, and as its VP of Finance since January 10, 2024, until her employment with the Company was terminated effective April 23, 2024. According to the 2024 Proxy Statement, as of April 12, 2024, Defendant Baron beneficially owned approximately 180,973 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2024 was $17.93, Defendant Baron owned approximately $3.2 million worth of SeaStar stock as of that date.

31.    For the 2023 Fiscal Year, Defendant Baron received $267,701 in total compensation. This included $210,000 in salary, $30,000 in bonus, $11,080 in stock awards, and $16,621 in option awards. For the 2022 Fiscal Year, Defendant Baron received $526,110 in total compensation from the Company. This included $160,000 in salary, $351,110 in stock awards, and $15,000 in non-equity incentive plan compensation.

32.    The Schedule 14A the Company filed with the SEC on May 19, 2023 (the "May 2023 Proxy Statement") stated the following about Defendant Baron:

> ***Caryl Baron*** has served as the Finance Controller of SeaStar Medical since 2020 and as our Interim Chief Financial Officer since October 28, 2022. Since 2013, Ms. Baron has also served as the Founder of Baroness Financial Consulting, an accounting consulting firm, in New York, New York. From 2011 to 2013, Ms. Baron served as the Controller of Rubenstein Public Relations, Inc., a full-service communications agency, in New York, New York. From 2008 to 2010, Ms. Baron served as the Vice President and Finance Director of Omnicon Health Group, a healthcare marketing and communications group, in New York, New York. From 2006 to 2008, Ms. Baron served as the Finance Manager of IMG, a global sports, events and talent management company, in New York, New York. From 2004 to 2006, Ms. Baron served as the Controller of Cornelia Day Resort, a luxury spa, in New York, New York. From 1996 to 2004, Ms. Baron served as the Financial Operations Manager of Tiffany & Co., a luxury jewelry and specialty retailer, in New York, New York. From 1992 to 1996, Ms. Baron served as the Assistant Controller for WPP, a multinational communications, advertising, public relations, and technology company, in New York, New York.

### Defendant Barnett

33.    Defendant Barnett has served as a Company director since January 2021. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 12, 2024, Defendant Barnett beneficially owned approximately 123,113 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2024 was $17.93, Defendant Barnett owned approximately $2.2 million worth of SeaStar stock as of that date.

34.    For the 2023 Fiscal Year, Defendant Barnett received $126,155 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $11,744 in stock awards, and $14,412 in option awards. For the 2022 Fiscal Year, Defendant Barnett received $87,887 in total compensation from the Company. This included $17,667 in fees earned or paid in cash and $70,220 in stock awards.

35.    The May 2024 Proxy Statement stated the following about Defendant Barnett:

**Rick Barnett** has received the Corporate Director certification from NACD in 2021 and has served as a Director of the SeaStar Medical since January 2021. Mr. Barnett served as President, Chief Executive Officer and Board Member of Satellite Healthcare, Inc. from 2014 to February 2021. Satellite Healthcare is Mr. Barnett has served as the Chairman of the Strategic Planning Committee, as well as a member of the Finance, Quality, Risk/Compliance, and Governance/Compensation committees for Satellite Healthcare, Inc. Mr. Barnett currently serves on the CutisCare, Inc. Board of Directors since 2021 and is a member of the Strategy and Audit Committee. CutisCare Inc. focuses on innovative approaches to wound care. Mr. Barnett has served a term as Chair of the Board of Directors of the National Kidney Foundation—Northern California, Pacific Northwest & NV Region, and a Board Member since 2018, where he served as a member of the Nominating, Strategic Partnerships, and Membership committees. He also served as Chair of the Board of Directors for the West Coast Sourcing Solutions, a product procurement company, from 2011 to 2014. From 2009 to 2014, Mr. Barnett served as a Senior Vice President of VHA, Inc., a purchasing cooperative for community-owned, nonprofit healthcare institutions. From 2006 to 2008, Mr. Barnett served as General Partner & Board Member of North State Surgery Centers, LLC, an ambulatory surgical clinic center. From 2005 to 2009, Mr. Barnett served as Chair of the Board of Directors of the Hospital Council of Northern California—Northern Sierra Section, a non-profit hospital and health systems trade association. We believe that Mr. Barnett is well-qualified to serve on the Board due to his extensive experience in strategic transactions and financial analysis for healthcare and medical device companies, as well as his expertise and skills in hospital operations, risk and compliance management, which will enhance and expand the Board's oversight capabilities over the Company's strategic directions in a complex healthcare market.

**Defendant Collins**

36.     Defendant Collins has served as a Company director since January 2021. He also serves as a member of the Audit Committee and the Compensation Committee. According to the 2024 Proxy Statement, as of April 12, 2024, Defendant Collins beneficially owned approximately 90,792 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2024 was $17.93, Defendant Collins owned approximately $1.6 million worth of SeaStar stock as of that date.

37.     For the 2023 Fiscal Year, Defendant Collins received $80,155 in total compensation from the Company. This included $54,000 in fees earned or paid in cash, $11,744

in stock awards, and $14,412 in option awards. For the 2022 Fiscal Year, Defendant Collins received $79,220 in total compensation from the Company. This included $9,000 in fees earned or paid in cash and $70,220 in stock awards.

38.    The May 2024 Proxy Statement stated the following about Defendant Collins:

**Allan Collins, MD** has served as a Director of SeaStar Medical since January 2021. Dr. Collins has served as the Chief Medical Officer at NxStage Medical, a medical device company for the treatment of kidneys since 2017. Since 1999, Dr. Collins has also served as the Executive Director of the Kidney Care Initiative at the Chronic Disease Research Group, a non-profit organization that focuses on answering questions on patient experiences with chronic diseases and a division of the Hennepin Healthcare Research Institute, in Minneapolis, Minnesota. From 1999 to 2014, Dr. Collins served as a Director within the United States Renal Data System, a national data system that analyzes information about chronic kidney disease. From 1990 to 2017, Dr. Collins worked for the Hennepin Faculty Associates, an independent medical group at the Hennepin County Medical Center in Minneapolis, Minnesota. From 1980 to 1990, Dr. Collins served as faculty at the Minneapolis Medical Research Foundation, a medical research non-profit organization, and the University of Minnesota School of Medicine. We believe that Dr. Collins is well-qualified to serve on our Board due to his substantial scientific and technical knowledge of medical devices similar to our products, as well as his extensive experience in managing and executing business and strategic plans for companies in the healthcare industry, which will contribute to the Board's ability to support and supervise the Combined Company's business operations. Given Dr. Collins medical expertise and experience, the Board believes he is qualified to serve as a Class II Director.

**Defendant Lobo**

39.    Defendant Lobo served as a Company director from May 2019 until he resigned effective June 5, 2024. He also served as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 12, 2024, Defendant Lobo beneficially owned approximately 52,267 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2024 was $17.93, Defendant Lobo owned approximately $937,147 worth of SeaStar stock as of that date.

40.    For the 2023 Fiscal Year, Defendant Lobo received $72,155 in total compensation from the Company. This included $46,000 in fees earned or paid in cash, $11,744 in stock awards, and $14,412 in option awards. For the 2022 Fiscal Year, Defendant Lobo received $7,667 in total compensation from the Company, which was made up entirely of fees earned or paid in cash.

41.    The May 2024 Proxy Statement stated the following about Defendant Lobo:

> **_Andres Lobo_** has served as a Director of SeaStar Medical since May 2019. Since 1994, Mr. Lobo has served in various roles at The Dow Chemical Company. At The Dow Chemical Company, since 2019, Mr. Lobo has served as the Risk Seeking Assets Director; from 2016 to 2019, Mr. Lobo served as the Corporate Real Estate Director; and from 2006 to 2016, Mr. Lobo served as a Customer Financial Services Portfolio Manager. At Dow Brasil S.A, a subsidiary of The Dow Chemical Company, from 2003 to 2006, Mr. Lobo served as a Senior Finance Manager; from 1999 to 2003, Mr. Lobo served as a Customer Financial Services Manager for Brazil and Latin America; from 1997 to 1999, Mr. Lobo served as a Customer Financial Services Manager for Argentina and Southern Cone; and from 1994 to 1997, Mr. Lobo served as a Credit & Collection Manager. From 1993 to 1994, Mr. Lobo served as a Corporate Account Manager at Leasing Andino S.A., a commercial leasing company, in Santiago, Chile. We believe that Mr. Lobo is well-qualified to serve on the Board due to his extensive expertise in executing investment, business and financial strategies for public companies, as well as his expertise in matters relating to corporate governance, financial risk management and strategic opportunities, which will contribute to the Board's ability to manage our growth and commercial plans.

### Defendant Rodgers

42.    Defendant Rodgers served as a Company director from November 2022 until June 2024. He previously served as Chair of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 12, 2024, Defendant Rodgers beneficially owned approximately 56,482 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2024 was $17.93, Defendant Rodgers owned approximately $1 million worth of SeaStar stock as of that date.

43.    For the 2023 Fiscal Year, Defendant Rodgers received $78,155 in total compensation from the Company. This included $52,000 in fees earned or paid in cash, $11,744

in stock awards, and $14,412 in option awards. For the 2022 Fiscal Year, Defendant Rodgers received $8,667 in total compensation from the Company, which was made up entirely of fees earned or paid in cash.

44.    The May 2023 Proxy Statement stated the following about Defendant Rodgers:

***Bruce Rodgers*** served as LMAO's Chief Executive Officer and President and was Chairman of its Board of Directors. Since completion of its initial public offering in October 2015, Mr. Rodgers has served as Chairman, Chief Executive Officer, and President of LMFA, an affiliate of the Sponsor and publicly traded company on the Nasdaq Capital Market. LMFA is a specialty finance company that provides funding to nonprofit community associations primarily located in the state of Florida and mines for Bitcoin. Mr. Rodgers was instrumental in developing LMFA's business model prior to its inception and was one of its primary investors. As LMFA's Chief Executive Officer, Mr. Rodgers has guided LMFA through its initial public offering, subsequent public offerings, and acquisitions of complementary businesses. Mr. Rodgers is a former business transactions attorney counseling numerous businesses with respect to mergers, acquisitions and capital raising transactions. In this capacity, Mr. Rodgers was an associate of Macfarlane, Ferguson, & McMullen, P.A. from 1991 to 1995 and a partner from 1995-1998 and was an equity partner of Foley & Lardner LLP from 1998 to 2003. Originally from Bowling Green, Kentucky, Mr. Rodgers holds an Engineering degree from Vanderbilt University (1985) and a Juris Doctor, with honors, from the University of Florida (1991). Mr. Rodgers also served as an officer in the United States Navy from 1985-1989 rising to the rank of Lieutenant, Surface Warfare Officer. Mr. Rodgers is a member of the Florida Bar and holds an AV-Preeminent rating from Martindale Hubbell. We believe that Mr. Rodgers is well-qualified to serve on our Board due to his experience in sourcing, negotiating and consummating acquisitions, and investment in and management of a financial services business.

**Defendant Russell**

45.    Defendant Russell served as a Company director from November 2022 until June 2024. He previously served as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 12, 2024, Defendant Russell beneficially owned approximately 72,267 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2024 was $17.93, Defendant Russell owned approximately $1.2 million worth of SeaStar stock as of that date.

46.     For the 2023 Fiscal Year, Defendant Russell received $72,155 in total compensation from the Company. This included $46,000 in fees earned or paid in cash, $11,744 in stock awards, and $14,412 in option awards. For the 2022 Fiscal Year, Defendant Russell received $7,667 in total compensation from the Company, which was made up entirely of fees earned or paid in cash.

47.     The May 2023 Proxy Statement stated the following about Defendant Russell:

***Richard Russell*** served as LMAO's Chief Financial Officer, Treasurer, Secretary and Director. Mr. Russell has also served as Chief Financial Officer of LMFA, an affiliate of the Sponsor and publicly traded company on the Nasdaq Capital Market since 2017. Since 2016, he has provided financial and accounting consulting services with a focus on technical and external reporting, internal auditing, mergers & acquisitions, risk management, and CFO and controller services. Mr. Russell also served as Chief Financial Officer for Mission Health Communities, offering management services for nursing and post-acute care facilities, from 2013 to 2016 and, before that, Mr. Russell served in a variety of roles for Cott Corporation, an American-Canadian beverage and food service company, from 2007 to 2013, including Senior Director Finance, Senior Director of Internal Auditing, and Assistant Corporate Controller. Mr. Russell's extensive professional experience with public companies includes his position as Director of Financial Reporting for Quality Distribution, a transportation and logistics company, from 2004 to 2007, and as Director of Financial Reporting for Danka Business Systems PLC, a supplier of photocopiers and office imaging equipment, from 2001 to 2004. Mr. Russell also served as Chief Financial Officer of Generation Income Properties, Inc., which is a real estate investment company that is publicly traded on the Nasdaq, a position he held from December 2019 to February 2022. Mr. Russell earned his Bachelor of Science in Accounting and a Master's in Tax Accounting from the University of Alabama, a Bachelor of Arts in International Studies from the University of South Florida, and a Master's in Business Administration from the University of Tampa. On March 1, 2020, Mr. Russell was appointed to the board of directors for TDNT, a publicly held consumer products company that has been trading on the OTCQB Venture Market since April 2015. Mr. Russell was also Chairman of the Hillsborough County Internal Audit Committee from January 2020 to April 2021 and has been a board member since August 2016. We believe that Mr. Russell is well-qualified to serve on our Board due to his experience in public company operations, including in the financial services industry, financial analysis and reporting, mergers and acquisitions, and risk management.

**<u>Defendant Van Heel</u>**

48.     Defendant Van Heel has served as a Company director since 2021 and previously served as a Company director from 2011 to 2015. He also serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 12, 2024, Defendant Van Heel beneficially owned approximately 196,413 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2024 was $17.93, Defendant Van Heel owned approximately $3.5 million worth of SeaStar stock as of that date.

49.     For the 2023 Fiscal Year, Defendant Van Heel received $88,155 in total compensation from the Company. This included $62,000 in fees earned or paid in cash, $11,744 in stock awards, and $14,412 in option awards. For the 2022 Fiscal Year, Defendant Van Heel received $80,553 in total compensation from the Company. This included $10,333 in fees earned or paid in cash and $70,220 in stock awards.

50.     The May 2024 Proxy Statement stated the following about Defendant Van Heel:

***Kenneth Van Heel*** has served as a Director of SeaStar Medical since 2021 and previously served as a Director from 2011 to 2015. Mr. Van Heel has also served as Chief Executive Officer at Motorcity Systems, a software provider in the trucking and transportation industry, since November 2021. Since June 2012, Mr. Van Heel has also served as a Director and Advisor at Gantec, Inc., a biotechnology company for agricultural products. From June 2019 to June 2021, Mr. Van Heel served as an Advisor at Motorcity Systems. Prior to joining Motorcity Systems, Mr. Van Heel served in various roles at The Dow Chemical Company. At The Dow Chemical Company, from 2016 to 2021, Mr. Van Heel served as the Global Director of Strategic Planning; from 2012 to 2016, Mr. Van Heel served as the Director of Alternative Investments and CIO Canadian Pension Plan; from 2006 to 2016, Mr. Van Heel served as Director of Alternative Investments; from 2003 to 2006, Mr. Van Heel served as the Senior Manager of Private Equity; from 2000 to 2003, Mr. Van Heel served as the Manager of Dow Corporate Venture Capital; and from 1986 to 2000, Mr. Van Heel held various positions within the Ventures and Business Development division. We believe that Mr. Van Heel is well-qualified to serve on the Board due to his extensive and deep experience in venture capital investment, financial analysis and reporting, risk management, strategic planning, and public company operations, as well as his expertise and skills in working with

16

companies in the medical device and healthcare industries, which will provide valuable oversight and guidance to our governance.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.    By reason of their positions as officers, directors, and/or fiduciaries of SeaStar and because of their ability to control the business and corporate affairs of SeaStar, the Individual Defendants owed SeaStar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SeaStar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of SeaStar and its shareholders so as to benefit all shareholders equally.

52.    Each director and officer of the Company owes to SeaStar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of SeaStar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54.    To discharge their duties, the officers and directors of SeaStar were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of SeaStar, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised SeaStar's Board at all relevant times.

56.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC and all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

57.    To discharge their duties, the officers and directors of SeaStar were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of SeaStar were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Colorado, and the United States, and pursuant to SeaStar's own Code of Business Conduct and Ethics ("Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how SeaStar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of SeaStar and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that SeaStar's operations would comply with all applicable laws and SeaStar's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.     Each of the Individual Defendants further owed to SeaStar and the shareholders the duty of loyalty requiring that each favor SeaStar's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.     At all times relevant hereto, the Individual Defendants were the agents of each other and of SeaStar and were at all times acting within the course and scope of such agency.

60.     Because of their advisory, executive, managerial, and directorial positions with SeaStar, each of the Individual Defendants had access to adverse, non-public information about the Company.

61.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SeaStar.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement

waste of corporate assets, abuse of control, and violations of Sections 14(a), 10(b), and 21D of the Exchange Act.

64.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of SeaStar, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of SeaStar and was at all times acting within the course and scope of such agency.

## SEASTAR'S CODE OF CONDUCT

### *Code of Conduct*

67.    The Company's Code of Conduct begins by stating that it "applies to all of our directors, officers, employees, and agents of the Company, whether they work for SeaStar or any of SeaStar's subsidiaries or affiliates on a full-time, part-time, consultative, or temporary basis."

The Code of Conduct also states that it "describes the core values and beliefs of SeaStar Medical Holding Corporation (together with its subsidiaries, the 'Company' or 'SeaStar') and provides the foundation for all business conduct."

68.    In a section titled "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> A conflict of interest occurs when an employee's private interests (or the interests of a member of their family) interfere, or appear to interfere, in any way with the interests of SeaStar. It is important to avoid even the appearance of a conflict of interest, since the appearance can be as damaging to SeaStar's reputation as an actual conflict. Employees must avoid any private interest that may influence their ability to act in the interests of SeaStar or that may make it difficult to perform their work objectively and effectively. As a guideline, ask yourself:
> • Is it legal?
> • Is it honest and fair?
> • Is it in the best interests of the Company?
> • Would you be embarrassed to read about it in the local newspaper?
>
> In addition, consider the following factors in evaluating a potential conflict of interest, among others:
> • whether it may interfere with your job performance or responsibilities;
> • whether you have access to confidential information;
> • whether it may interfere with job performance, responsibilities or morale of others within SeaStar;
> • any potential adverse or beneficial impact on SeaStar's business;
> • any potential adverse or beneficial impact on SeaStar's relationships with customers, suppliers or other service providers;
> • whether it would enhance or support a competitor's position;
> • the extent to which it would result in financial or other benefits (direct or indirect) to you;
> • the extent to which it would result in financial or other benefits (direct or indirect) to one of SeaStar's customers, suppliers or other service providers; and
> • the extent to which it would appear improper to an outside observer.

69.    In a section titled "Protection and Use of Company Assets," the Code of Conduct states:

> SeaStar employees should protect SeaStar's assets and ensure their efficient use for legitimate business purposes. Theft, carelessness, and waste have a direct impact on SeaStar's profitability. The use of the funds or assets of SeaStar for any unlawful or improper purpose is strictly prohibited. SeaStar employees may not use SeaStar

22

assets for their personal benefit. To ensure the protection and proper use of SeaStar's assets, each SeaStar employee should: • exercise reasonable care to prevent theft, damage or misuse of SeaStar property, whether tangible or intangible; • promptly report the actual or suspected theft, damage or misuse of SeaStar property; • safeguard all electronic programs, data, communications and written materials from inadvertent access by others; and • use SeaStar property for legitimate business purposes in accordance with the SeaStar Employee Handbook.

70.    In a section titled "Confidential Information," the Code of Conduct states:

SeaStar employees have access to a variety of confidential information. Confidential information includes all non-public information that might be of use to competitors or members of the public, or potentially harmful to SeaStar or its customers, if disclosed. Such information also includes news that has not yet been released, but that would greatly benefit SeaStar in the public's eye. Unauthorized disclosure of confidential information could cause competitive harm to SeaStar and could result in legal liability to you and SeaStar. Employees have a duty to safeguard and not disclose any confidential information, except when disclosure is authorized by SeaStar or legally mandated. This requirement applies both while employed by SeaStar and after your employment ends. Each employee is required and expected to execute the Employee Proprietary Information and Inventions Assignment Agreement and the Confidentiality Agreement, and to abide by all of the provisions in the agreement, including all of the provisions concerning the protection of Company confidential information. Although SeaStar employees should not disclose the Company's documents outside of SeaStar, please keep in mind that anything written could become public through disclosure by others or in an investigation or litigation. Inaccurate or incomplete statements can be taken out of context and create embarrassment and liability. Accordingly, treat all statements on SeaStar's behalf, including e-mails, as serious business communications which should accurately reflect the facts and compliance with the Company's policies. Any question or concern regarding whether disclosure of SeaStar confidential information is permissible or legally mandated should be promptly referred to the Compliance Officer.

71.    In a section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct states:

SeaStar is a public company and is required to report its financial results and other information about its business to the public and the Securities and Exchange Commission. SeaStar is subject to various securities laws and regulations. Our policy is to disclose, in accordance with all applicable requirements, accurate and complete information regarding our business, financial condition, and results of operations. Employees must understand and strictly comply with generally accepted accounting principles as adopted by SeaStar and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and

forecasts. Inaccurate, incomplete or untimely reporting can severely damage SeaStar or result in legal liability and will not be tolerated.

SeaStar employees should be on guard for, and promptly report, any possibility of inaccurate or incomplete financial reporting. Particular attention should be paid to:

• financial results that seem inconsistent with the performance of the underlying business;
• transactions that do not seem to have an obvious business purpose; and
• requests to circumvent ordinary review and approval procedures.

SeaStar's senior financial officers have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. Any practice or situation that might undermine this objective should be reported to the Compliance Officer. Reports should be made in accordance with the SeaStar Whistleblower Policy.

72.     In a section titled "SeaStar Records," the Code of Conduct states:

Accurate and reliable records are crucial to our business and form the basis of our earnings statements, financial reports and other disclosures to the public. Our records are the source of essential data that guide business decision-making and strategic planning.

All SeaStar records must be complete, accurate and reliable in all material respects. There is never an acceptable reason to make false or misleading entries. Undisclosed or unrecorded funds, payments, or receipts are strictly prohibited. You are responsible for understanding and complying with the record keeping policy applicable to you. Contact the Compliance Officer if you have any questions.

A legal hold suspends all document destruction procedures in order to preserve appropriate records under special circumstances, such as litigation or government investigations. Legal counsel determines and identifies what types of records or documents are required to be placed under a legal hold. The Compliance Officer, or his/her designee, will notify you if a legal hold is placed on records for which you are responsible. You then must preserve and protect the necessary records in accordance with instructions from SeaStar's legal counsel.

73.     In a section titled "Compliance with Laws and Regulations," the Code of Conduct states:

Each SeaStar employee has an obligation to comply with the laws of the cities, states and countries in which SeaStar operates. We will not tolerate any activity that violates any laws, rules, or regulations applicable to SeaStar. This includes, without limitation, laws covering commercial bribery and kickbacks, copyrights,

trademarks and trade secrets, protection of third party/former employer confidential information, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. Employees are expected to understand and comply with all laws, rules and regulations that govern your conduct as an employee of SeaStar. If any doubt exists about whether a course of action is lawful, you should seek advice immediately from the Compliance Officer.

74.    In a section titled "Insider Trading," the Code of Conduct states:

Directors and employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about SeaStar or about companies with which we do business is considered confidential information. We have adopted a separate Insider Trading Policy to which you are bound as a condition of your employment. You should consult the Insider Trading Policy for more specific information on the definition of "material nonpublic information" and on buying and selling our securities or securities of companies with which we do business.

75.    In a section titled "Waivers," the Code of Conduct states:

Any waiver of any provision of this Code for a member of the Board of Directors or an executive officer must be approved in writing by the Board of Directors and promptly disclosed in accordance with applicable law. Any waiver of any provision of this Code with respect any other employee must be approved in writing by the Compliance Officer.

76.    The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

### SEASTAR'S AUDIT COMMITTEE CHARTER

***Audit Committee Charter***

77.    In a section titled "Purpose," the Audit Committee Charter states the following, in

relevant part:

> The purpose of the Audit Committee (the "Committee") is to oversee the accounting and
> financial reporting processes of the Company and the audits of the financial statements of the
> Company, and to assist the Board with its oversight responsibilities regarding: (i) the integrity of
> the Company's financial statements; (ii) the Company's compliance with legal and regulatory
> requirements; (iii) the independent auditor's qualifications, independence and performance; (iv)
> the Company's internal accounting and financial controls; and (v) the performance of the
> Company's internal audit function. The Committee shall prepare the report required by the rules
> of the Securities and Exchange Commission (the "SEC") to be included in the Company's proxy
> statement for its annual meeting.

78.    In a section titled "Meetings with Management, the Independent Auditor and the

Internal Auditor regarding Annual Financial Statements and Annual Audit," the Audit Committee

Charter listed the following responsibilities of the Audit Committee:

> 1. The Committee shall meet with management, the independent auditor and the internal auditor in connection with each annual audit to discuss the scope and timing of the audit, the procedures to be followed, the relative responsibilities of the independent auditor and management and the staffing of the audit.
>
> 2. The Committee shall review and discuss with management and the independent auditor: (A) major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, if any; (B) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the

26

Company's financial statements; and (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

3. The Committee shall review and discuss the annual audited financial statements and related notes with management and the independent auditor, as well as the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the form of audit opinion to be issued by the auditors on the financial statements.

79.    With respect to the Company's financial statements, the Audit Committee Charter

states the following:

D. Recommendation to Include Financial Statements in Annual Report. The Committee shall, based on the review and discussions in paragraphs B.3. and C.3. above, and based on the disclosures received from the independent auditor regarding its independence and discussions with the auditor regarding such independence pursuant to subparagraph A((4)(ii) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

E. Quarterly Financial Statements. The Committee shall review and discuss the quarterly financial statements with management and the independent auditor.

80.    Regarding "Other Powers and Responsibilities," the Code of Conduct states:

1. The Committee shall assist the Board in its oversight of the Company's internal controls, including by meeting periodically with the Company's management, internal auditor and independent auditor to review the adequacy of such controls, and to review the disclosure regarding such controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.

2. The Committee shall discuss with management and the independent auditor the Company's financial information and earnings guidance, if any, provided to analysts and rating agencies and earnings releases. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made).

3. The Committee shall establish and periodically review policies and procedures for the review, approval, and ratification, as applicable, of all related party transactions (as defined in applicable SEC rules) on an ongoing basis, and all such transactions must be reviewed and approved by the Committee.

4. The Committee shall assist the Board in the oversight and monitoring of the Company's code of business conduct and ethics policy and other compliance matters.

5. The Committee shall discuss with management and the independent auditor any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies, internal controls, or internal audit function.

6. The Committee shall discuss with the Company's general counsel or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

7. The Committee shall discuss with management the Company's policies with respect to risk assessment and risk management. The Committee shall discuss with management the Company's significant financial risk exposures and the actions management has taken to limit, monitor or control such exposures. The Committee shall discuss and review executive officer and director indemnification matters.

8. The Committee will review and discuss the Company's disclosure controls and procedures, and the quarterly assessments of such controls and procedures by the Company's principal executive officer and principal financial officer. The Committee shall also review disclosures regarding the Company's internal control over financial reporting made to the Committee by the Company's principal executive officer and principal financial officer during their certification process for the Annual Report on Form 10-K and Quarterly Report on Form 10- Q, including any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

9. The Committee shall at least annually review and assess the Company's investment policies and performance, and treasury functions including cash management procedures.

10. The Committee shall set clear hiring policies for employees or former employees of the Company's independent auditor.

11. The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters. The Committee shall also establish procedures for the confidential and anonymous submission by employees regarding questionable accounting or auditing matters.

12. The Committee shall discuss with management the existence, status and resolution of any tax audits, including periodic updates of significant developments related to each audit.

13. The Committee shall periodically discuss with management the Company's information technology initiatives. These discussions shall include education on cybersecurity and other risks relevant to the Company, and specific safeguards in place to prevent or detect a cybersecurity incident that could be harmful to the Company. Additionally, management shall notify the Committee of any incidents, successful attacks or breaches, as well as resulting corrective actions and plans to prevent similar incidents in the future.

14. The Committee shall provide the Company with the report of the Committee with respect to the audited financial statements that is required by the SEC's proxy rules to be included in the Company's annual proxy statements.

15. The Committee shall at least annually perform an evaluation of the performance of the Committee and its members, including a review of the Committee's compliance with this Charter.

16. The Committee shall at least annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

81. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by issuing materially false and misleading statements to the investing public, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures and failing to adequately oversee the Company's disclosure controls and procedures.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

82. SeaStar originally operated as a SPAC named LMAO.

83.     On April 22, 2022, the Company, then operating as LMAO, and Legacy SeaStar announced that they had entered into the Merger Agreement. Legacy SeaStar was a medical technology company focused on developing extracorporeal therapies to reduce the effects of excessive inflammation on vital organs. The Merger Agreement represented that the combined company following the merger would be known as "SeaStar Medical Holding Corporation" and would be led by the same management team as Legacy SeaStar. Moreover, the Merger Agreement revealed that, through the Merger, all Legacy SeaStar shares owned by Legacy SeaStar's existing equity holders would be converted into Class A Common Stock of the combined company.

84.     Leading up to the Merger, Legacy SeaStar and the Company boasted of the overall prospects of the combined company following the Merger. Indeed, they asserted, *inter alia*, that Legacy SeaStar had an enterprise value of approximately $85 million and further that Legacy SeaStar's SCD was a promising treatment for hyperinflammation and had extensive regulatory and commercial prospects. The companies also announced that Legacy SeaStar was planning to submit an application for FDA approval for its SCD under the HDE to be commercialized to treat pediatric AKI.

85.     The companies also disclosed that the Merger had already been approved on a unanimous basis by the Company's and Legacy SeaStar's boards, and further that the holders of a majority of Legacy SeaStar's voting power had also approved the Merger.

86.     On July 20, 2022, SeaStar and Legacy SeaStar disclosed to investors that Legacy SeaStar had submitted the HDE Application with the FDA for use of Legacy SeaStar's SCD for children suffering from AKI, which purportedly "follow[ed a] successful pilot study demonstrating the SCD was safe with probable clinical benefits for pediatric patients[.]"

87.    On October 17, 2022, SeaStar, Legacy SeaStar, and Vellar entered into the Prepaid Forward Agreement, pursuant to which Vellar was allowed to purchase through a broker in the open market shares of Class A common stock, par value $0.0001 per share, of SeaStar (together with the shares of common stock of the post-Merger Company) from holders of those shares, other than SeaStar or SeaStar affiliates.

88.    On October 18, 2022, SeaStar's stockholders voted to approve the Merger.

89.    On October 28, 2022, SeaStar and Legacy SeaStar consummated the Merger pursuant to the terms of the Merger Agreement. Through the Merger, Merger Sub merged with and into Legacy SeaStar, with Legacy SeaStar surviving as a wholly owned subsidiary of SeaStar. Upon the completion of the Merger, the Company changed its name to "SeaStar Medical Holding Corporation," and the Company took over Legacy SeaStar's business, operations, and management.

90.    The following trading day, October 31, 2022, SeaStar's common stock and warrants began publicly trading on the NASDAQ under the ticker symbols "ICU" and "ICUCW," respectively.

**FALSE AND MISLEADING STATEMENTS**

***October 31, 2022 Press Release***

91.    During pre-market hours on October 31, 2022, the Company published a press release (the "October 2022 Press Release") announcing the Merger and announcing that the newly combined Company had begun trading on the NASDAQ. In addition, the October 2022 Press Release outlined SeaStar's near-term catalysts and corporate strategy and touted the HKD Application, stating the following, in relevant part:

> The Company's innovative platform therapy, the SCD, is a patented cell-directed extracorporeal therapy that selectively targets the most activated pro inflammatory

31

neutrophils and monocytes to stop the cytokine storm that causes organ failure and possible death in critically ill patients. The therapy works with continuous kidney replacement therapy (CKRT) to target and neutralize pro-inflammatory neutrophils and monocytes allowing the body to return to homeostasis.

\* \* \*

Based on positive findings from SeaStar Medical's Pilot Study (NCT02820350) of pediatric patients with AKI which demonstrated that the SCD was safe for use in pediatric patients, the Company filed for [HDE] with the [FDA] for use of the SCD for critically ill children over 20 kg with AKI.

*Upcoming Expected Value-Driving Milestones*

• Q1 2023: FDA approval under HDE
• Q2 2023: Commercial launch of SCD for pediatric AKI

92.    In addition, the October 2022 Press Release quoted Defendant Schlorff, who further stated the following, in relevant part:

SeaStar Medical has continued to deliver on its promises with operational excellence. I am incredibly pleased with the progress made and proud of the team that has put in a tremendous amount of effort to get the Company to where we are today . . . . As a publicly listed company, we gain valuable access to the capital markets which I believe will help build momentum and propel the Company to the next level of growth. In addition to the progress we've made on the corporate front, we continue to advance our innovative SCD therapy platform. We have a number of value-driving anticipated milestones, including our potential near-term evolution to a commercial stage company driven by potential FDA approval in our lead program, pediatric AKI . . . . I am excited for what is to come and look forward to providing updates as we execute on the milestones ahead.

***November 3, 2022 Press Release***

93.    On November 3, 2022, the Company published a press release (the "November 2022 Press Release") "announc[ing] positive interim data" from an ongoing study which studied the SCD in children. The November 2022 Press Release represented that "[t]he SCD is currently being evaluated by the FDA for [HDE] marketing approval for use in children (>20 kgs) with AKI"; that "[t]he Company expects the FDA to complete a substantive review of its HDE application during the first quarter of 2023, with a potential commercial launch expected in the second quarter of 2023"; and that "Stuart Goldstein, MD, Director of the Center for Acute Care

Nephrology at Cincinnati Children's Hospital" had "served as a consultant to SeaStar Medical in the preparation and submission of the HDE [A]pplication."

***November 14, 2022 Form 10-Q***

94.    On November 14, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the quarterly period ended September 30, 2022 (the "3Q22 10-Q"). Regarding the Company's classification of certain warrants as liabilities, the 3Q22 10-Q stated the following, in relevant part:

> The Company evaluates all of its financial instruments, including issued stock purchase warrants, to determine if such instruments are derivatives or contain features that qualify as embedded derivatives, pursuant to ASC 480 and ASC 815-15. The classification of derivative instruments, including whether such instruments should be recorded as liabilities or as equity, is re-assessed at the end of each reporting period. In accordance with ASC 825-10 "Financial Instruments", offering costs attributable to the issuance of the derivative warrant liabilities have been allocated based on their relative fair value of total proceeds and are recognized in the statement of operations as incurred.
>
> The 10,350,000 warrants issued in connection with the IPO (the "Public Warrants") and the 5,738,000 Private Placement Warrants are recognized as derivative liabilities in accordance with ASC 815-40. Accordingly, the Company recognizes the warrant instruments as liabilities at fair value and adjust the instruments to fair value at each reporting period. The liabilities are subject to re-measurement at each balance sheet date until exercised. The fair value of the Public Warrants issued are estimated using the quoted market price and Private Placement Warrants have been estimated using a Monte Carlo simulation model each measurement date.
> Derivative warrant liabilities are classified as non-current liabilities as their liquidation is not reasonably expected to require the use of current assets or require the creation of current liabilities.

95.    The 3Q22 10-Q also downplayed how severe and widespread the deficiencies in the Company's financial controls and procedures were, stating the following, in relevant part:

> Our management evaluated, with the participation of [the Individual Defendants], the effectiveness of our disclosure controls and procedures as of September 30, 2022, pursuant to Rule 13a-15(b) under the Exchange Act. Based upon that evaluation, [the Individual Defendants] concluded that, as of September 30, 2022, our disclosure controls and procedures were not effective.

Specifically, management's determination was based ***solely*** on the following material weaknesses which existed as of September 30, 2022. Since inception in 2020 to the present, the Company did not effectively segregate certain accounting duties due to the small size of its accounting staff. In addition, we did not have sufficient controls in place surrounding the accounting of complex financial instruments. This lack of control led to improper accounting classification of warrants we issued in January 2021 which, due to its impact on our financial statements. This lack of control led to improper accounting classification of warrants we issued in January 2021 which we determined to be a material weakness. This mistake in classification was brought to our attention only when the SEC issued a Staff Statement on Accounting and Reporting Considerations for Warrants Issued by [SPACs] dated April 12, 2021 (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants of a kind similar to those we issued at the time of our initial public offering in January 2021.

\* \* \*

In connection with the evaluation of the SEC Statement and management's subsequent re-evaluation of its Prior Financials, the Company determined that there were errors in its accounting for its warrants and shares as temporary equity. Management concluded that a deficiency in internal control over financial reporting existed relating to the accounting treatment for complex financial instruments and that the failure to properly account for such instruments constituted a material weakness. This material weakness resulted in the need to restate the Prior Financials.

96.    In addition, the 3Q22 10-Q represented that, "[n]otwithstanding the determination that our internal control over financial reporting was not effective, as of September 30, 2022, and that there was a material weakness as identified in this Quarterly Report, we believe that our financial statements contained in this Quarterly Report fairly present our financial position, results of operations and cash flows for the periods covered hereby in all material respects." In other words, the 3Q22 10-Q represented that the accuracy of the Company's reported financial results would not be impacted by the identification of a material weakness related to SeaStar's accounting for warrants.

97.    The 3Q22 10-Q also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Schlorff and Baron attesting that the 3Q22 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make

the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

### December 2, 2022 Press Release

98.    On December 2, 2022, the Company published a press release titled "SeaStar Medical Bolsters Operational Expertise with Appointment of Thomas R. Mullen as Vice President of Operations and Product Development" (the "December 2022 Press Release"). The December 2022 Press Release stated the following, in relevant part:

> SeaStar . . . today announced the appointment of Thomas R. Mullen as Vice President of Operations and Product Development. Mr. Mullen is a proven medical device professional with 30 years of experience leading business operations, manufacturing, engineering, *product development and regulatory remediation*.
> * * *
> Mr. Mullen has served as a consultant to SeaStar Medical since 2020, during which time he oversaw contract manufacturing activities, *assisted with agency submissions and provided remediation of compliance documentation*.
> * * *
> As VP, Operations and Product Development, Mr. Mullen will oversee the development and advancement of the Company's [SCD] . . . . The SCD is currently being evaluated by the FDA for a[n HDE] marketing approval for use in children (>20 kgs) with [AKI]. The Company expects the FDA to complete a substantive review of its HDE application during the first quarter of 2023, with a potential commercial launch expected in the second quarter of 2023.

99.    In addition, the December 2022 Press Release quoted Defendant Schlorff, who stated the following, in relevant part:

> SeaStar Medical has continued to evolve and remains on a trajectory of growth including near-term potential for commercialization. As we continue our preparations for success in treating both acute and chronic illnesses through advanced product offerings, we believe Tom's extensive experience and expertise will be invaluable. We have had the pleasure of working with Tom since 2020 and during that time he has, among other things, *ensured that our business objectives*

***and agency regulations were met***. As we continue to progress, we are pleased to welcome him as VP, Operations and Product Development, and look forward to continuing to leverage the leadership and skills he has amassed over the course of his career[.]

### March 30, 2023 Press Release

100.    On March 30, 2023, the Company published a press release to announce its financial results for the 2022 Fiscal Year and provide an update on SeaStar's business (the "2022 Earnings Release"). Among other things, the 2022 Earnings Release reported that, for the 2022 Fiscal Year, the Company's total assets were approximately $4.77 million, while its total liabilities were approximately $13 million.

101.    The 2022 Earnings Release also stated the following, in relevant part, regarding the HDE Application:

> We anticipate our first U.S. regulatory approval for the SCD will be for pediatric patients with AKI being treated in the ICU with CKRT.
>
> * * *
>
> • In June 2022 we submitted an [HDE] application to the FDA, having met the criteria with clinical results showing safety and probable clinical benefit to critically ill children with AKI who have few treatment options. A noncontrolled pivotal study funded by the FDA Office of Orphan Products Development showed that those treated with the SCD had no reported adverse events, a 50% reduction in mortality rate and no dialysis required at Day 60. The U.S. addressable population of about 4,000 pediatric patients is within the 8,000-patient HDE criteria.
> • We continue active discussions with the FDA regarding the HDE application and remain hopeful for a near-term determination.

### March 30, 2023 Form 10-K

102.    Also on March 30, 2023, the Company filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K"), which was signed by Defendants Schlorff, Baron, Barnett, Van Heel, Lobo, Collins, Rodgers, and Russell. The 2022 10-K affirmed that, for the 2022 Fiscal Year, the Company had total assets of approximately $4.77 million and total liabilities of approximately $13 million.

103.    The 2022 10-K stated the following regarding the Company's various warrants and the classification of those warrants:

Prior to the [Merger], SeaStar Medical, Inc. had outstanding warrants to purchase shares of SeaStar Medical, Inc.'s preferred stock which had been issued in conjunction with various debt financings. Upon effectiveness of the [Merger], 57,942 outstanding warrants were converted into 69,714 warrants to purchase common stock of SeaStar Medical Holding Corporation ("Legacy SeaStar Warrants") at their previous exercise prices. On December 31, 2022, there were 69,714 Legacy SeaStar Warrants outstanding, which are accounted for as equity.

As part of LMAO's initial public offering, under the Warrant Agreement dated as of January 25, 2021 and, prior to the effectiveness of the [Merger], LMAO issued 10,350,000 warrants each of which entitled the holder to purchase one share of common stock at an exercise price of $11.50 per share ("Public Stockholders' Warrants"). Simultaneously with the closing of the Initial Public Offering, LMAO completed the private sale of 5,738,000 million warrants each of which entitled the holder to purchase one share of common stock at an exercise price of $11.50 per share, to LMAO's sponsor ("Private Placement Warrants"). Upon the effectiveness of the [Merger], the outstanding Public Stockholders' Warrants and Private Placement Warrants automatically converted into warrants of SeaStar Medical Holding Corporation. The Company has reviewed the terms of the warrants to determine whether the warrants should be classified as liabilities or stockholders' deficit in its consolidated balance sheets. In order for a warrant to be classified in stockholders' deficit, the warrant must be (a) indexed to the Company's equity and (b) meet the conditions for equity classification in ASC 815-40, Derivatives and Hedging-Contracts in an Entity's own Equity. If a warrant does not meet the conditions for equity classification, it is carried on the consolidated balance sheets as a warrant liability measured at fair value, with subsequent changes in the fair value of the warrant recorded in the consolidated statements of operations as change in fair value of warrants. The Company determined that the warrants are required to be classified as stockholders' deficit as of the date of the [Merger]. The Company has the ability to redeem outstanding Public Shareholders' Warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of our common stock equals or exceeds $18.00 per share . . . for any 20 trading days within a 30 day trading-day period. The Company does not have the ability to redeem the Private Placement Warrants. The Private Placement Warrants were valued at $6,688 at the date of the [Merger] date. On December 31, 2022, there were 10,350,000 Public Shareholders' Warrants outstanding and 5,738 Private placement Warrants outstanding.

On October 28, 2022, the Company entered into a Private Investment in Public Equity ("PIPE") Agreement, pursuant to which the PIPE investors purchased an aggregate of 700,000 shares of common stock at $10.00 per share and received 700,000 PIPE Investor Warrants, which entitled the holder to purchase one share

of common stock of SeaStar Medical Holding Corporation at $11.50 per share, for an aggregate purchase price of $7,000. At December 31, 2022, there were 700,000 PIPE Investor Warrants outstanding, which are accounted for as equity.

104.    The 2022 10-K also stated the following, in relevant part, regarding the Prepaid

Forward Agreement between SeaStar, Legacy SeaStar, and Vellar and SeaStar's accounting for

the same:

> On October 17 and October 25, 2022, LMAO and [Legacy SeaStar] entered into forward purchase agreements ("FPA") with [Vellar] and HB Strategies LLC ("HB Strategies" and together with Vellar, the "FPA Sellers"). According to the terms of the FPAs, the FPA Sellers purchased, through a broker in the open market, shares of Class A Common Stock from holders other than LMAO or affiliates of LMAO, including from holders who had previously elected to redeem shares pursuant to the redemption rights in connection with the [Merger] (such purchased shares, the "Recycled Shares").
>
> * * *
>
> The FPA Sellers may in its [sic] discretion sell Recycled Shares they purchased, (the "Terminated Shares"). The Company is entitled to proceeds from sales of Terminated Shares equal to the number of Terminated Shares multiplied by the Reset Price (the "Reset Price"). Following the closing of the [Merger] (the "Closing"), the Reset Price will initially be $10.00 per Share, but will be adjusted on the last scheduled trading day of each month commencing on the first calendar month following the Closing to the lowest of (a) the then-current Reset Price, (b) $10.00 and (c) the volume weighted average price ("VWAP Price") of the Shares of the last ten (10) trading days of the prior calendar month, but not lower than $5.00.
>
> The maturity date of the FPA (the "Maturity Date") will be the earliest of (a) the third anniversary of the Closing, and (b) after any occurrence during any 30 consecutive trading-day period, the VWAP Price for 20 trading days is less than $3.00 per Share, at the FPA Seller decision.
>
> At the Maturity Date, the FPA Sellers will be entitled to retain a cash amount equal to the number of unsold Recycled Shares multiplied by $2.50, and the FPA Sellers will deliver to the Company the unsold Recycled Shares.
>
> As of December 31, 2022, the FPA Sellers have paid the Company proceeds from sales of Terminated Shares of $0.0 million. While the Company may receive cash proceeds from sales of Terminated Shares by FPA Sellers, the FPA Sellers may not have any incentive to sell Terminated Shares unless the trading price of our Common Stock is above the Reset Price. The Reset Price on February 10, 2023 was $5.00 per share, and there is no guarantee that the trading price of our Common Stock will equal or exceed the current Reset Price, or that the future trading price

of our Common Stock may equal or exceed the Reset Price in subsequent applicable periods. In such a case, the FPA Sellers may not sell Terminated Shares, in which case we will not be able to receive any cash proceeds from the FPAs. In addition, if the FPA Sellers decide to sell their shares into the market, it may cause the trading price of our Common Stock to decline significantly.

105.     In addition, the 2022 10-K downplayed how severe and widespread the deficiencies in the Company's financial controls and procedures were and overstated Defendants' attempts to remediate the same, stating the following, in relevant part:

> In the course of preparing the consolidated financial statements that are included in this Annual Report, the Company has identified material weaknesses in its internal controls over financial reporting as of December 31, 2022, which relates to a deficiency in the design and operation of its financial accounting and reporting controls . . . . Specifically, the Company identified deficiencies in internal controls over financial reporting which were determined to rise to the level of material weakness. The Company has identified that additional headcount will be addressed in the near term to allow for further research and internal dialogue on complex accounting transactions prior to final conclusion. The Company will also continue to review the overall internal control environment as we develop the requisite internal control framework.

106.     In addition, the 2022 10-K attached SOX certifications signed by Defendants Schlorff and Baron and attesting that the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

107.     The statements in ¶¶91-106 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) SeaStar had downplayed the severity and scope of the deficiencies in its financial controls and procedures and had overstated Defendants' efforts to address the same; (2) due to the foregoing, the Company had failed to correctly account for the classification of

certain outstanding warrants and the Prepaid Forward Agreement; (3) as a result, the Company was likely to restate one or more of its previously issued financial statements; and (4) due to the foregoing, the Company's post-Merger business and financial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE AS THE FALSE AND MISLEADING STATEMENTS CONTINUE

### *May 9, 2023 Press Release*

108.    The truth began to emerge during post-market hours on May 9, 2023 when the Company published a press release (the "May 2023 Press Release"). The May 2023 Press Release revealed, among other things, that SeaStar had received a letter from the FDA's CBER rejecting SeaStar's HDE application for its pediatric SCD. In relevant part, the May 2023 Press Release stated:

> SeaStar . . . has received a letter from the [CBER] of the [FDA] regarding the Company's [HDE] application for its pediatric [SCD], which is designed to treat critically ill children with [AKI] on [CKRT]. In the letter, *the FDA indicated that the application is not approvable in its current form* but outlined specific guidance as to how the application may be amended and resubmitted successfully.

109.    In addition, the May 2023 Press Release quoted Defendant Schlorff, who stated the following, in relevant part:

> We are disappointed by the FDA's decision not to approve our HDE application at this time. After a series of collaborative meetings and correspondence over the past 10 months, and repeatedly being responsive to the Agency's recommendations, this determination is surprising[.]
>
> * * *
>
> We believe that each of the current deficiencies cited by the Agency in their letter are readily addressable. However, we intend to initially request FDA's administrative review and submit an appeal if needed. In parallel, we plan to implement other mitigations, where appropriate, and continue working with CBER with the goal of achieving pediatric HDE approval[.]

110.   On this news, the Company's stock price fell $0.77 per share, or 39.69%, from a closing price of $1.94 per share on May 9, 2023 to close at $1.17 per share on May 10, 2023. However, despite this partial emergence of the truth and the accompanying hit to SeaStar's stock, the Individual Defendants continued to make false and misleading statements to investors regarding the true scope and severity of SeaStar's financial controls and procedures deficiencies.

### May 15, 2023 Press Release and Form 10-Q

111.   On May 15, 2023, the Company published a press release: (1) announcing its financial results for the first quarter of the 2023 Fiscal Year ("1Q23"); and (2) disclosing an update to SeaStar's business. The press release represented, *inter alia*, that: (1) SeaStar's total liabilities were $14.27 million; (2) SeaStar's net total other expenses came to $521,000; and (3) SeaStar's net loss amounted to approximately $5.3 million for 1Q23.

112.   The same day, the Company filed its quarterly report on Form 10-Q with the SEC for 1Q23 (the "1Q23 10-Q"), which was signed by Defendants Schlorff, Baron, Barnett, Van Heel, Lobo, Collins, Rodgers, and Russell. The 1Q23 10-Q affirmed that: (1) Seastar's total liabilities were $14.27 million; and (2) SeaStar's net loss amounted to approximately $5.3 million for 1Q23. The 1Q23 10-Q also represented that SeaStar's net total other expenses came to $681,000 (as opposed to $521,000) for 1Q23.

113.   Moreover, with respect to the Prepaid Forward Agreement and SeaStar's accounting for the same, the 1Q23 10-Q contained substantively the same statements as those in ¶104 above.

114.   The 1Q23 10-Q also downplayed how severe and widespread the deficiencies in the Company's financial controls and procedures were and overstated the Defendants' efforts to address the same, repeating substantively the same statements as those in ¶105 above.

115.    In addition, the 1Q23 10-Q attached SOX certifications signed by Defendants Schlorff and Baron and attesting that the 1Q23 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

### *May 2023 Proxy Statement*

116.    On May 19, 2023, the Company filed the May 2023 Proxy Statement with the SEC. Defendants Barnett, Lobo, Russell, Rodgers, Collins, Schlorff, and Van Heel solicited the May 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

117.    The May 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Barnett and Lobo to the Board; and (2) ratify the appointment of Armanino LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

118.    With respect to the Company's Code of Conduct, the May 2023 Proxy Statement stated:

> Our Board of Directors has adopted a Code of Business Conduct and Ethics, and charters for our Nominating and Corporate Governance Committee, Audit Committee and Compensation Committee to assist the Board in the exercise of its responsibilities and to serve as a framework for the effective governance of the Company. You can access our current committee charters and our Code of Business Conduct and Ethics in the "Governance" section under "Governance Documents" of our investor relations page of our website located at investors.seastarmedical.com, or by writing to c/o Corporate Secretary at our offices at 3513 Brighton Blvd, Suite 410, Denver, CO 80216.

***

> We have adopted a Code of Business Conduct and Ethics applicable to our directors, executive officers and employees. The Code of Business Conduct and Ethics is available on our website at http://https://investors.seastarmedical.com/governance/governance-documents.
>
> The Company will disclose any amendments to, or waivers of, provisions of our Code of Business Conduct and Ethics on our website.

119.    In a section titled "Risk Oversight," the May 2023 Proxy Statement stated the following about the Board's risk oversight responsibilities:

> The Board will administer the risk oversight function directly through the Board as a whole, as well as through its committees, where applicable, monitoring and assessing strategic risk exposure, enterprise risk, and governance risks. The audit committee will be responsible for considering and discussing our major financial risk exposures and the steps our management has taken to monitor and control these exposures. The compensation committee will be responsible for reviewing and assessing the risks associated with the compensation arrangements of executive management, including the lack of alignment between the incentives of management and the interests of stockholders. The allocation of risk oversight responsibility may change, from time to time, based on the evolving needs of the Company.

120.    Defendants Barnett, Lobo, Russell, Rodgers, Collins, Schlorff, and Van Heel caused the May 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) SeaStar had downplayed the severity and scope of the deficiencies in its financial controls and procedures and had overstated Defendants' efforts to address the same; (2) due to the foregoing, the Company had failed to correctly account for the classification of certain outstanding warrants and the Prepaid Forward Agreement; (3) as a result, the Company was likely to restate one or more of its previously issued financial statements; and (4) due to the foregoing, the Company's post-Merger business and financial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

121.    The May 2023 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the

Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the May 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

122.    As a result of Defendants Barnett, Lobo, Russell, Rodgers, Collins, Schlorff, and Van Heel causing the May 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Barnett and Lobo to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of Armanino LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

### *August 14, 2023 Press Release and Form 10-Q*

123.    On August 14, 2023, the Company published a press release: (1) announcing its financial results for the second quarter of the 2023 Fiscal Year ("2Q23"); and (2) disclosing an update to SeaStar's business. The press release represented, *inter alia*, that: (1) SeaStar's total liabilities came to approximately $13.78 million for 2Q23; (2) SeaStar's net total other expenses came to $595,000 for 2Q23; and (3) SeaStar's net loss amounted to approximately $8.93 million for the six months ended June 30, 2023.

124.    The same day, the Company filed its quarterly report on Form 10-Q with the SEC for 2Q23 (the "2Q23 10-Q"), which was signed by Defendants Schlorff and Baron. The 2Q23 10-Q affirmed that: (1) SeaStar's total liabilities came to approximately $13.78 million for 2Q23; (2) SeaStar's net total other expenses came to $595,000 for 2Q23; and (3) SeaStar's net loss amounted to approximately $8.93 million, for the six months ended June 30, 2023.

125.    Moreover, with respect to the Prepaid Forward Agreement and SeaStar's accounting for the same, the 2Q23 10-Q stated the following, in relevant part:

> During the six months ended June 30, 2023, 374,005 recycled shares were sold by Forward Purchase Agreement Sellers ("FPA Sellers"). The Company received $1,870 for the shares sold and recognized a gain of $1,306 on the sale. Losses on remeasurement of $69 and $1,723 were recorded in Change in fair value of forward option-prepaid forward contracts on the unaudited condensed consolidated statements of operations for the three and six months ended June 30, 2023, respectively.
>
> In March 2023, the price of the Company stock was below $3.00 for more than 20 trading days and the FPA Sellers at their discretion had the ability to specify thematurity dates for the FPA. During the three months ended June 30, 2023, the FPA Sellers specified the maturity dates and the FPAs matured and were settled by transferring 1,096,972 shares to the FPA Sellers, with a fair value of $558. As the FPAs were classified as a liability at fair value, upon settlement, the FPAs were marked to their fair value at the settlement dates and the liability was settled.

126.    The 2Q23 10-Q also downplayed how severe and widespread the deficiencies in the Company's financial controls and procedures were and overstated the Defendants' efforts to address the same, repeating substantively the same statements as those in ¶105 above.

127.    In addition, the 2Q23 10-Q attached SOX certifications signed by Defendants Schlorff and Baron and attesting that the 2Q23 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

***November 14, 2023 Press Release and Form 10-Q***

128.    On November 14, 2023, the Company published a press release: (1) announcing its financial results for the third quarter of the 2023 Fiscal Year ("3Q23"); and (2) disclosing an update

to SeaStar's business. The press release represented, *inter alia*, that: (1) SeaStar's total liabilities were $18.15 million for the quarter; (2) SeaStar's net total other expenses came to approximately $5.09 million for the nine months ended September 30, 2023; and (3) SeaStar's net loss amounted to approximately $16.36 million for the nine months ended September 30, 2023.

129.    The same day, the Company filed its quarterly report on Form 10-Q with the SEC for 3Q23 (the "3Q23 10-Q"), which was signed by Defendants Schlorff and Baron. The 3Q23 10-Q affirmed that: (1) SeaStar's total liabilities were $18.15 million for the quarter; (2) SeaStar's net total other expenses came to approximately $5.09 million for the nine months ended September 30, 2023; and (3) SeaStar's net loss amounted to approximately $16.36 million for the nine months ended September 30, 2023.

130.    Moreover, with respect to the Prepaid Forward Agreement and SeaStar's accounting for the same, the 3Q23 10-Q stated the following, in relevant part:

> During the nine months ended September 30, 2023, 374,005 recycled shares were sold by Forward Purchase Agreement Sellers ("FPA Sellers"). The Company received $1,870 for the shares sold and recognized a gain of $1,306 on the sale.
>
> Losses on remeasurement of $0 and $1,723 were recorded in Change in fair value of forward option-prepaid forward contracts on the unaudited condensed consolidated statements of operations for the three and nine months ended September 30, 2023, respectively.
>
> In March 2023, the price of the Company stock was below $3.00 for more than 20 trading days and the FPA Sellers at their discretion had the ability to specify the maturity dates for the Forward Purchase Agreements ("FPA"). During the nine months ended September 30, 2023, the FPA Sellers specified the maturity dates and the FPAs matured and were settled by transferring 1,096,972 shares to the FPA Sellers, with a fair value of $558. As the FPAs were classified as a liability at fair value, upon settlement, the FPAs were marked to their fair value at the settlement dates and the liability was settled.

131.    The 1Q23 10-Q also downplayed how severe and widespread the deficiencies in the Company's financial controls and procedures were and overstated the Defendants' efforts to address the same, repeating substantively the same statements as those in ¶105 above.

132.    In addition, the 3Q23 10-Q attached SOX certifications signed by Defendants Schlorff and Baron and attesting that the 3Q23 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

133.    The statements in ¶¶111-115 and ¶¶123-132 above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) SeaStar had downplayed the severity and scope of the deficiencies in its financial controls and procedures and had overstated Defendants' efforts to address the same; (2) due to the foregoing, the Company had failed to correctly account for the classification of certain outstanding warrants and the Prepaid Forward Agreement; (3) as a result, the Company was likely to restate one or more of its previously issued financial statements; and (4) due to the foregoing, the Company's post-Merger business and financial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **THE TRUTH FULLY EMERGES**

134.    The truth fully emerged on March 27, 2024 when, during pre-market hours, the Company published a press release (the "March 2024 Press Release") revealing that it would be restating its financial statements for the Affected Periods. In relevant part, the March 2024 Press Release stated:

> SeaStar . . . will restate its financial statements for the fiscal year ended December 31, 2022 and for the interim periods ended March 31, 2023, June 30, 2023 and September 30, 2023.
>
> The restatement will impact the accounting treatment and classification of certain outstanding warrants and the [Prepaid Forward Agreement]. Due to the additional audit procedures involved in the restatement, SeaStar Medical expects to file Form 12b-25 with the [SEC], which provides issuers with a 15-day grace period to file an Annual Report on Form 10-K, which is deemed to have been timely filed.

135.    In addition, the March 2024 Press Release quoted Defendant Schlorff, who stated the following, in relevant part:

> The restatement is not expected to have a material impact on our business operations or our cash position, but rather is related to the reporting of non-cash accounting items . . . . We pursued a [SPAC] as our route to become a public company in late 2022 due to the challenging market conditions at that time. Many SPACs, including ours, relied on a host of complex financial instruments. Unfortunately, we determined that certain complex financial instruments required accounting treatment that differed from our previous judgment, which led to the need for a restatement.

136.    Later on March 27, 2024, also during pre-market hours, the Company filed a current report on Form 8-K (the "March 2024 8-K") with the SEC. The March 2024 8-K gave additional information with respect to SeaStar's need to restate its financial statements for the Affected Periods, stating the following, in relevant part:

> On March 21, 2024, after discussion with the Company's management, the Audit Committee determined that a restatement of the Company's audited financial statements for the fiscal year ended December 31, 2022 and unaudited interim financial statements for the fiscal quarters ended March 31, 2023, June 30, 2023 and September 30, 2023 would be appropriate in order to restate the accounting treatment of the following instruments:

1. *Classification of Warrants* — Private placement and PIPE warrants (the "**Liability Classified Warrants**") were originally classified as components of stockholders' equity, however, there were certain features that precluded equity classification in accordance with ASC 815-40 – Derivatives and Hedging - Contracts in Entity's Own Equity and resulted in the warrants being liability classified. The Liability Classified Warrants are required to be remeasured at each reporting period date, and the changes in fair value recognized as a component of earnings.

2. *Prepaid Forward Purchase Agreements* — The prepaid forward purchase agreements were originally accounted for as net assets of the Company, with changes in fair value recognized through earnings. However, after further analysis, the prepaid forward purchase agreements should have been accounted for as hybrid instruments constituting a combination of (i) a subscription receivable on the Company's own common stock and (ii) an embedded derivative liability in the form of a future settlement at maturity of $2.50 per share of the Company's common stock not sold off to investors. The prepayment amount is required to be classified in the equity section of the Company's consolidated balance sheet and the derivative liability is required to be remeasured at each reporting period date, and the changes in fair value recognized as a component of earnings.

The Company's [CFO] and Audit Committee discussed the matters disclosed herein with WithumSmith+Brown, PC, ("WSB") who was appointed as the Company's independent registered public accounting firm on November 28, 2023, as well as Armanino LLP, the Company's independent registered accounting firm prior to the WSB appointment.

The Company intends to include the (i) original and (ii) the amended and restated (including the necessary reconciling bridges): (a) Consolidated Balance Sheets, (b) Consolidated Statements of Operations, (c) Consolidated Statements of Changes in Stockholders' Deficit and (d) Consolidated Statements of Cash Flows necessary to provide the relevant understanding of those financial statement captions restated for the following periods: (1) As of and the year-ended December 31, 2022, (2) three-months ended March 31, 2023, (3) three-and six-months ended June 30, 2023, and (4) three-and nine-months ended September 30, 2023. The proposed restatement described above impacts non-cash items in the Company's financial statements.

In addition, the Company expects to disclose in its Form 10-K a material weakness in its design and operation of effective internal controls over financial reporting in connection with the aforementioned restatement.

137.    On this news, the Company's stock price fell approximately $0.04 per share, or 4.84%, from a closing price of approximately $0.75 per share on March 26, 2024 to close at approximately $0.71 per share on March 27, 2024.

### Subsequent Developments

138.    On April 16, 2024, the Company filed an annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K disclosed the Company's amended and restated financial statements for the Affected Periods as follows: (1) for Fiscal Year 2022, total assets that declined from approximately $4.77 million to approximately $3.04 million, as well as total liabilities that increased from approximately $13 million to $23.8 million; (2) for 1Q23, total liabilities that increased from $14.27 million to approximately $27.02 million; (3) for 2Q23, total liabilities that increased from approximately $13.78 million to approximately $14.35 million; and (4) for 3Q23, total liabilities that increased from $18.15 million to approximately $18.53 million.

139.    In addition, the 2023 10-K reported that: (1) for the three months ended March 31, 2023, net total other expenses had increased from $681,000 to approximately $2.52 million, while net losses had increased from approximately $5.3 million to approximately $7.1 million; (2) for the six months ended June 30, 2023, net total other expenses had increased from $595,000 to approximately $1.21 million, while net losses had increased from approximately $8.93 million to approximately $9.54 million; and (3) for the nine months ended September 30, 2023, net total other expenses had increased from approximately $5.09 million to approximately $5.5 million, while net losses had increased from approximately $16.36 million to approximately $16.78 million.

### DAMAGES TO SEASTAR

140. As a direct and proximate result of the Individual Defendants' conduct, SeaStar has lost and expended, and will lose and expend, many millions of dollars.

141. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

142. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

143. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

144. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

145. As a direct and proximate result of the Individual Defendants' conduct, SeaStar has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

146.    Plaintiff brings this action derivatively and for the benefit of SeaStar to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of SeaStar, waste of corporate assets, unjust enrichment, gross mismanagement, abuse of control, and violations of the Exchange Act.

147.    SeaStar is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

148.    Plaintiff is, and has continuously been at all relevant times, a shareholder of SeaStar. Plaintiff will adequately and fairly represent the interests of SeaStar in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

149.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

150.    A pre-suit demand on the Board of SeaStar is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Barnett, Collins, Schlorff, and Van Heel (the "Director-Defendants"), and non-parties Jennifer A. Baird, John Neuman, and Bernadette N. Vincent (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

151.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts which renders them unable to impartially

investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

152.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

153.    Additional reasons that demand on Defendant Schlorff is futile follow. Defendant Schlorff has served as the Company's CEO and as a Company director since July 2019. He previously served as the Company's COO from March 2019 to July 2019. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Schlorff with his principal occupation for which he receives handsome compensation. Defendant Schlorff was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he personally made and those for which he signed SOX certifications. In addition, he solicited the May 2023 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting several of the Individual Defendants to the Board. He also signed the false and misleading 2022 10-K. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Schlorff is a defendant in the Securities Class Action. For these reasons, too,

Defendant Schlorff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Barnett is futile follow. Defendant Barnett has served as a Company director since January 2021. He also serves as a member of the Audit Committee and as Chair of the Compensation Committee. The Company provides Defendant Barnett with handsome compensation for his role as a director. In addition, he solicited the May 2023 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting several of the Individual Defendants to the Board. He also signed the false and misleading 2022 10-K. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Barnett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Collins is futile follow. Defendant Collins has served as a Company director since January 2021. He also serves as a member of the Audit Committee and the Compensation Committee. The Company provides Defendant Collins with handsome compensation for his role as a director. In addition, he solicited the May 2023 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting several of the Individual Defendants to the Board. He also signed the false and misleading 2022 10-K.  As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Collins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Van Heel is futile follow. Defendant Van Heel has served as a Company director since 2021 and previously served as a Company director from 2011 to 2015. He also serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Van Heel with handsome compensation for his role as a director. In addition, he solicited the May 2023 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting several of the Individual Defendants to the Board. He also signed the false and misleading 2022 10-K.  As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Van Heel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on the Board is futile follow.

158.    Defendants Van Heel (as Chair), Barnett, and Collins (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging

in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

159.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act.  In violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

160.    SeaStar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for SeaStar any part of the damages SeaStar suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

161.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

162.    The acts complained of herein constitute violations of fiduciary duties owed by SeaStar's officers and directors, and these acts are incapable of ratification.

163.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of SeaStar. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of SeaStar, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

164.    If there is no directors' and officers' liability insurance, then the Directors will not cause SeaStar to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

165.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

168.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

169.    Defendants Barnett, Lobo, Russell, Rodgers, Collins, Schlorff, and Van Heel caused  the May 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*,

that: (1) SeaStar had downplayed the severity and scope of the deficiencies in its financial controls and procedures and had overstated Defendants' efforts to address the same; (2) due to the foregoing, the Company had failed to correctly account for the classification of certain outstanding warrants and the Prepaid Forward Agreement; (3) as a result, the Company was likely to restate one or more of its previously issued financial statements; and (4) due to the foregoing, the Company's post-Merger business and financial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

170.    The May 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the May 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

171.    As a result of Defendants Barnett, Lobo, Russell, Rodgers, Collins, Schlorff, and Van Heel causing the May 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Barnett and Lobo to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of Armanino LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

172.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the May 2023 Proxy Statement.

173.    Plaintiff, on behalf of SeaStar, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of SeaStar's business and affairs.

176.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

177.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of SeaStar.

178.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

179.    In further breach of their fiduciary duties owed to SeaStar, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) SeaStar had downplayed the severity and scope of the deficiencies in its financial controls and procedures and had overstated Defendants' efforts to address the same; (2) due to the foregoing, the Company had failed to correctly account for the classification of certain outstanding warrants and the Prepaid Forward Agreement; (3) as a result, the Company was likely to restate one or more of its previously issued financial statements; and (4) due to the foregoing, the Company's post-Merger business and

financial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

180.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

181.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

182.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith,

should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

183.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

184.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, SeaStar has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.    Plaintiff, on behalf of Seastar, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence SeaStar, for which they are legally responsible.

188.    As a direct and proximate result of the Individual Defendants' abuse of control, SeaStar has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189.    Plaintiff, on behalf of SeaStar, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

190.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SeaStar.

192.     The Individual Defendants either benefitted financially from the improper conduct or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

193.     Plaintiff, as a shareholder and a representative of SeaStar, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

194.     Plaintiff, on behalf of SeaStar, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

195.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of SeaStar in a manner consistent with the operations of a publicly held corporation.

197.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, SeaStar has sustained and will continue to sustain significant damages.

198.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

199.     Plaintiff, on behalf of SeaStar, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

200.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

202.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

203.     Plaintiff, on behalf of SeaStar, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Schlorff and Baron for Contribution Under Sections 10(b) and 21D of the Exchange Act

204.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

205.     SeaStar, along with Defendants Schlorff and Baron, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Schlorff's and Baron's willful and/or reckless violations of their obligations as officers and/or directors of SeaStar.

206.    Defendants Schlorff and Baron, because of their positions of control and authority as officers and/or directors of SeaStar, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of SeaStar, including the wrongful acts complained of herein and in the Securities Class Action.

207.    Accordingly, Defendants Schlorff and Baron are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

208.    As such, SeaStar is entitled to receive all appropriate contribution or indemnification from Defendants Schlorff and Baron.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of SeaStar, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to SeaStar;

(c)    Determining and awarding to SeaStar the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing SeaStar and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect SeaStar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following

resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of SeaStar to nominate at least four candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)    Awarding SeaStar restitution from the Individual Defendants, and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 12, 2024              Respectfully submitted,

                       **THE BROWN LAW FIRM, P.C.**

                       */s/ Timothy Brown*
                       Timothy Brown
                       767 Third Avenue, Suite 2501
                       New York, NY 10017
                       Telephone: (516) 922-5427
                       Facsimile: (516) 344-6204

Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Docusign Envelope ID: 55ADCD5A-1421-41B9-9AE0-3314E6C58F89

## **VERIFICATION**

I, Jose Lazo, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12h day of December, 2024.

Signed by:

*Jose Lazo*

5C83C13B3BF9433...

Jose Lazo